UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                            Case No. 20-20346
                                    Honorable Victoria A. Roberts

JOHNATHAN KETZNER,

      Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [ECF No. 18]

## I.    INTRODUCTION

On May 21, 2020, Johnathan Ketzner ("Ketzner") was a passenger in an SUV driven by Sarah Leary ("Leary"). Adrian Police Officer Adryan Robinson ("Robinson") pulled Leary over for driving without insurance. Within seconds of asking Leary questions regarding her license, registration and insurance, Robinson asked if there were any drugs or weapons in the car. She said, "No." Over the course of the traffic stop for lack of insurance, Robinson asked Leary and Ketzner more questions pertaining to guns and drugs. Eventually, Robinson retrieved a bag from the SUV and ordered Ketzner to remove the items from it. At the bottom of the bag was a gun. Robinson immediately placed Ketzner under arrest.

The government charges Ketzner with two counts of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). These charges stem from evidence discovered during two traffic stops: the first on April 26, 2020 (Count I) and the second on May 21, 2020 (Count II).

Ketzner only challenges the felon in possession charge arising from the May 21st search. While he does not contest the validity of the traffic stop, he does challenge the constitutionality of the so-called inventory search. The government says it was a lawful protective search under *Terry v. Ohio*, 392 U.S. 1 (1963). It also says Ketzner consented to the search. Finally, the government argues that the gun should not be excluded because it would have inevitably been discovered during Robinson's inventory search.

"When faced with a motion to suppress based on the Fourth Amendment, the government must establish by a preponderance of the evidence that the police conduct did not amount to an unreasonable search and seizure." *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

Based upon the testimony and evidence presented at the evidentiary hearing on Thursday, February 4, 2021, the Court finds that the government failed to meet its burden. Ketzner was subjected to an unlawful

and unconstitutional search, not justified by any exception to the Fourth

Amendment warrant requirement.

The Court **GRANTS** Ketzner's motion to suppress.

## II.   BACKGROUND

On May 21, 2020 at approximately 4:40 p.m., Robinson pulled over a

silver Chevy Equinox for not having insurance. The entire traffic stop was

recorded on a body camera that Robinson wore. Leary drove the SUV, and

Ketzner sat in the front passenger seat; two other passengers sat across

the back row: Javon Knoblauch ("Javon") and Alexis Wagner ("Wagner").

While still in the SUV, Leary readily admitted that she did not have

insurance on the Equinox. After eliciting the names of all passengers,

Robinson ran a search of Ketzner and Leary's names.

Robinson returned to the Equinox and asked Leary to exit the SUV.

Robinson and Leary walked back to his squad car and he again asked her

a series of questions relating to guns or drugs. Leary denied the presence

of any contraband. For the next three minutes, Robinson repeatedly asked

for Leary's consent to search the car. She refused.

After multiple attempts to gain Leary's consent to search, Robinson

led Leary to believe that because she would not consent, he had no choice

but to tow the car. Nevertheless, Leary declined to consent. In response, Robinson told Leary he was going to tow the SUV.

Robinson and Leary walked back to the Equinox. Leary asked Robinson if she could remove a purse, a "bag with her son's clothes" and various other items from the car before Robinson searched. Robinson told her to hold on for a second and to wait on the side of the street.

Robinson then ordered Ketzner and the others to exit the SUV. As Ketzner prepared to follow this command, he asked Robinson if he could take his "stuff" with him. Robinson asked him which items were his and Ketzner advised Robinson that he had cigarettes and roughly $7,000 in cash. Robinson told him to leave that in the car. Robinson asked Ketzner if he had any guns or drugs. Ketzner said no, but he had a bag of weed. (Robinson Body Cam Timestamp (12:00)) (hereafter, all references will include only the timestamp). Robinson told Ketzner to show him the bag of weed and Ketzner did. Robinson advised Ketzner to leave his phone and cigarettes on the dash and to get out.

Ketzner stepped out of the Equinox, and Robinson conducted a pat down search of him. Robinson said, "just making sure you don't have any weapons or anything like that." (12:30). Robinson also patted down Javon.

Before the tow truck arrived, Robinson began handing Leary's items back to her. He removed Leary's purse and keys that were in the driver's seat, placed them on top of his cruiser and called Leary over to retrieve them. Once Leary arrived at the cruiser, Robinson told her to open her purse. Robinson searched her purse. When he was done, Robinson radioed for a tow truck. (16:35).

After Robinson finished searching the purse, he returned to his cruiser and radioed to dispatch that Ketzner has close to $10,000 on him bundled like he's selling dope. Since Leary would not let him search the car, he concluded that he would tow it.

Robinson summoned Leary back to the cruiser and Leary told him Kim Jenkins ("Jenkins") was responsible for insuring the Equinox. Robinson contacted Jenkins, who confirmed she had no insurance on the SUV.

While typing the police report, Robinson told Wagner and Javon that they were free to go. He also told Ketzner that he could leave but that he may want to stay to retrieve his cash, still located in the SUV.

Thirty-nine minutes into the stop, Robinson returned to the Equinox and began to search the driver's side, the trunk and finally the passenger side. He removed a white plastic Meijer bag and asked Leary if the bag was hers. She said no. Robinson then asked Ketzner if the bag was his

and he said yes. Robinson said to Ketzner "you're going to open – just take that stuff out for me real quick – I'll hold it for you." (41:50). Ketzner began to remove the contents of the bag. As Ketzner removed a hoodie, Robinson saw the gun at the bottom of the bag. Robinson immediately placed Ketzner under arrest.

## III.   ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects," including vehicles, "against unreasonable searches and seizures." U.S. CONST. amend. IV; *United States v. Snoddy*, 976 F.3d 630, 632 (6th Cir. 2020).

Ketzner argues officers violated his Fourth Amendment rights when they detained him and searched his bag because: (1) the inventory search Robinson conducted was a ruse to generally rummage for incriminating evidence and not conducted according to Michigan State Police or Adrian Police Department policy; (2) Robinson did not have a reasonable belief based on articulable facts that Ketzner was armed and dangerous; and (3) Ketzner did not consent to the search.

The government says application of the exclusionary rule would be wholly inappropriate since Robinson searched Ketzner's bag pursuant to a lawful inventory search, and because he had reasonable suspicion that

Ketzner would harm him with the hidden firearm. The government also says Ketzner consented to the search.

### A.   Evaluating a Fourth Amendment Challenge in the Context of a Traffic Stop

The stop and detention of a motorist is a seizure under the Fourth Amendment. *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000); *United States v. Arvizu*, 534 U.S. 266, 273 (2002). A routine traffic stop is more analogous to a so-called *Terry* stop than to a formal arrest. *Knowles v. Iowa*, 525 U.S. 113, 117 (1998); *Unites States v. Noble*, 762 F.3d 509, 519 (6th Cir. 2014). Passengers are considered seized during a traffic stop and have all the rights that are extended to the driver to challenge that seizure and evidence obtained. *Brendlin v. California*, 551 U.S. 249, 263 (2007); *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012).

For a seizure to withstand Fourth Amendment scrutiny, the Court must determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion." *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir. 1986), cert. denied, 479 U.S. 1097 (1987).

If the traffic stop is properly based, the Court must next assess "whether the degree of intrusion into the suspect's personal security was

reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id*.

### B. Ketzner Does Not Challenge the Legality of the Stop but Challenges what he calls an Illegal Search of His Bag

Ketzner does not challenge the lawfulness of the traffic stop. Based on the testimony given by Robinson, it appears there would be no basis for such a challenge.

When officers stop a vehicle – regardless of the duration and purpose of the stop – it is subject to the constitutional imperative of reasonableness. *Whren v. United States*, 517 U.S. 806, 810 (1996). "An automobile stop is considered reasonable where the police have probable cause to believe that a traffic violation has occurred." *Wilson v. Trumbull Cty.*, OH, 69 F. App'x 282, 284 (6th Cir. 2003). The officer's subjective motivation is irrelevant when there is probable cause to justify the traffic stop. *Whren*, 517 U.S. at 819.

Robinson had the right to put the Equinox's license plate into the data system. The discovery that it was uninsured constituted probable cause to stop the driver for a traffic violation. Under Michigan law, "the owner or registrant of a motor vehicle required to be registered in this state shall maintain security for payment of benefits under personal protection

insurance and property protection insurance." M.C.L. § 500.3101. These circumstances gave Robinson probable cause to stop the SUV.

The Court will now discuss what Ketzner does challenge about this traffic stop.

### C.    Robinson Failed to Conduct a Valid Inventory Search

The general rule is that warrantless searches of vehicles "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). "An inventory search is a recognized exception to the Fourth Amendment's warrant requirement: where the police are in lawful custody of a vehicle, they may conduct an inventory search to catalog its contents pursuant to standardized criteria." *United States v. Alexander*, 954 F.3d 910, 915 (6th Cir. 2020) (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990)). The purpose of an inventory search is "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *United States v. Smith*, 510 F.3d 641, 650-51 (6th Cir. 2007). A vehicle is lawfully seized and, thus, subject to an inventory search if it is lawfully impounded. *United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012).

9

Ketzner does not challenge the impoundment; nor does he challenge that an inventory search can include the search of all containers in the car. Ketzner contends, relying on *United States v. Hockenberry*, 730 F.3d 645, 659 (6th Cir. 2013), that inventory searches are valid only to the extent officers follow a standardized criteria … or established routine to assure that inventory searches are not a "ruse for a general rummaging in order to discover incriminating evidence." *Id*.

The Adrian Police are required to follow the Adrian Police Department Policy and Procedure on the Inventory of Impounded Vehicles. The government seems to concede that Robinson may have failed to strictly follow the standardized approach in conducting this search. Nonetheless, the government argues there is no evidence of bad faith on Robinson's part, and that the law allows for some flexibility and practical judgment in how inventory searches are conducted.

The government misses the mark and the command of *Hockenberry* and its progeny.

The standardized criteria is Rule 84.1.8 - Adrian Police Department's Policy and Procedure on the Inventory of Impounded, Abandoned, or Forfeiture Vehicles. It reads:

"III. PROCEDURE:

A) Vehicles to be inventoried:

> 1) All Officers shall conduct an inventory of the items of personal property which may be contained in any vehicle which is:
>
> > a) An impounded vehicle…

B) Inventory Procedure:

> 1) The vehicle held shall be inventoried as soon as practical by one of the Officers investigating the case specific to the vehicle.
>
> > a) Any area of the vehicle which may contain personal property is to be checked. Any property located of reasonable value should be listed on the Adrian Police Department Inventory form."

The government provided Robinson's Impounded Vehicle Supplemental Report. It is a pre-printed form. Robinson failed to list any item he found in Leary's SUV. Government counsel contends it was because there were no items of "reasonable value" in the SUV. However, Leary is captured on camera saying her son's clothes were in the car. Robinson testified that there was a spare tire in the trunk. Minimally, these items should have been listed. The "hubcaps/wheels" portion of the form should have been checked as well.

Officers exercising their discretion to impound a vehicle must do so "according to standard criteria and on the basis of something other than

suspicion of evidence of criminal activity." *Snoddy*, 976 F.3d at 633-34;

*United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001).

Although officers are allowed "some flexibility and practical judgment in how such searches are carried out," neglecting to inventory any item signals a flagrant disregard of Leary's and the car owner's property rights and evidences Robinson's bad faith and ulterior motive for his so-called inventory search. *See Hockenberry*, 730 F.3d at 661.

Robinson admitted he intentionally deceived Leary; he suggested on several occasions that if she consented to a search it would not be necessary for him to tow the car. He did this while knowing that there was a valid basis to otherwise search and that her consent was unnecessary. But he attempted numerous times to obtain her consent. He asked:

- "Is there anything illegal in the car? Any guns drugs or anything?" (1:15)

- "Do you care if we check?" (7:10-7:20)

- "is[sic] there any guns in the car? Any weed in the car? Any hard or soft in the car?" (7:45)

- "So, you don't care if we check real quick?" (7:52)

- "So how are we going to do this because I don't think you're being too truthful with me." (8:09)

- "So then why don't you want me to search it? (8:18)

- "Is there weed in the car?" (8:23)

- "So, what's the big deal?" (8:40)

- "So, I'm going to ask you one more time do I have your permission to search the car?" (10:05)

From the outset Robinson focused on the possibility of criminal activity. Two minutes into the stop Robinson radioed to dispatch, "she [Leary] was twitching a little bit so we'll see what she says here in a couple minutes." He testified he could tell she was not being truthful. After Robinson finished searching Leary's purse, he returned to his cruiser and radioed to dispatch that Ketzner "has close to $10,000 on him bundled up like he's been selling dope. I didn't go through it yet; I still have to search the car but I'm not seeing any dope." (16:40). While typing the police report, an unnamed officer over the radio mentioned that Robinson should potentially "get a search warrant" and "bring the dogs" in to search for drugs. Robinson responded that he still needs to do his inventory search (17:27). The same unknown officer told Robinson, "you can do your inventory search, but I think you're going to let him walk with that unless you can come up with something now." (18:00).

Officers exercising their discretion to impound a vehicle must do so "on the basis of something other than suspicion of evidence of criminal activity." *Snoddy*, 976 F.3d at 633–34; *Kimes*, 246 F.3d at 805. A search is unconstitutional if "the evidence establishes that the 'police acted in bad faith or for the sole purpose of investigation' in conducting an inventory search." *Hockenberry*, 730 F.3d at 659 (citation omitted). Officers cannot hide an investigative search under the pretext of an inventory search. *Snoddy*, 976 F.3d at 633–34.

It is clear to the Court that Robinson's intention was to investigate drug activity rather than to conduct an inventory search. The best evidence is his failure to list any inventory on the required inventory form. Essential to a valid inventory search is the presence of good faith and the absence of police motive to circumvent the Fourth Amendment warrant requirement by calling a search for evidence of a crime, an inventory search.

This was a general search for evidence of a crime unrelated to the traffic stop, and for evidence of a drug crime in particular. This so-called inventory search was objectively unreasonable, pretextual and illegal. The Court declines to uphold it under the inventory search exception to the Fourth Amendment warrant requirement. *United States v. Taylor*, 636 F.3d 461 (8th Cir. 2011).

14

### D.   Ketzner Did Not Consent to a Search

The challenged search is of a Meijer bag that was on the floor of the passenger side of the car where Ketzner sat.

After Robinson spoke by telephone to Jenkins and confirmed that she did not have insurance on the Equinox, he began to search the SUV at the driver's side where he first noticed the bag. He moved to the trunk and concluded with the passenger side. As he opened the passenger side door, Robinson again saw the Meijer bag on the floor in front of the passenger seat. Robinson removed the bag and asked to whom it belonged. Ketzner said it was his. On cross-examination, Robinson confirmed he said, "you're going to open – just take that stuff out for me real quick. I'll hold it for you." Ketzner began to remove the contents of the bag. The government says this was consent. Once Ketzner removed the sweatshirt, Robinson saw a Smith and Wesson .38 caliber revolver.

In determining whether consent was voluntary, the Court considers "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *United States v. Blomquist*, 976 F.3d 755, 759 (6th Cir. 2020).

And - when seeking to justify a search based on consent - the government has the burden to show that consent was "freely and voluntarily given, and was not the result of coercion, duress, or submission to a claim of authority." *United States v. Lee*, 793 F.3d 680, 685 (6th Cir. 2015) (internal citations omitted) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). The voluntariness of the consent is determined by the "totality of the circumstances," and must be proven by "clear and positive" proof. *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir.1977). Although "consent may be given in words, conduct, [and] even gestures," *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004), "the scope of consent is determined by a reasonableness standard: how would the prototypical everyman or everywoman see it?" *Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 615 (6th Cir. 2018).

Reasonable people could find that Robinson ordered and did not request Ketzner to remove the contents of the bag. The Court is cognizant that "the distinction between a question and command can be slippery." *United States v. Cowan*, 704 F. App'x 519, 523 (6th Cir. 2017). However, the Sixth Circuit in *Harris v. Klare*, framed the distinction between a question and a command quite succinctly:

> The difference between asking… whether an individual consents to a search and asking whether an individual can take

> an action that will facilitate a search is the difference between a
> request that can be freely declined and a command that cannot.

902 F.3d 630, 640 (6th Cir. 2018) (quoting *United States v. Cowan*,

704 F. App'x 519, 527–28 (6th Cir. 2017) (Moore, J., dissenting)).

It was reasonable for Ketzner to interpret the phrase "[y]ou're going to

open - just take that stuff out for me," as a command. Robinson's order is

analogous to the officer's order "would you step over here" which the *Harris*

court found to be a command rather than a question. *Harris*, 902 F.3d at

640.

The characteristics of the detention also weigh against a finding that

Ketzner consented to Robinson's search. The nature of police questioning

and the environment in which it takes place are factors which the Court

evaluates in trying to decide whether the police engaged in inherently

coercive tactics. *Schneckloth v. Bustamonte*, 412 U.S. 218, 247 (1973).

When Robinson gave his command, Ketzner was detained by two officers

(Robinson and Deputy Kyle Gouwens), Robinson had already patted

Ketzner down and Ketzner complied with this order.

Other factors indicate coercion and duress. Here, for a simple failure

to have insurance, Robinson detained Leary and Ketzner for over forty-four

minutes. Additionally, the fact that Robinson did not apprise Ketzner of his

right to refuse in any way weighs against the government. *See*

*Schneckloth*, 412 U.S. at 227 ("the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.").

Robinson patted down only the two men of color, Javon and Ketzner; he did not pat down either of the two white women detained. When Ketzner asked whether he could take his money and cigarettes, Robinson responded, "that's going to stay in the car… just throw them on the dash." (11:50). Over the course of the entire interaction Robinson gave several orders to Ketzner. He ordered Ketzner to step out of the car; to leave his money in the car; he patted Ketzner down even though he testified he had no basis to do so. Each time, Ketzner acquiesced to Robinson's authority. *See United States v. Worley*, 193 F.3d 380, 387 (6th Cir. 1999).

Under the totality of circumstances, the Court finds Ketzner did not consent to the search of his bag. Robinson exercised authority over Ketzner, detained him and commanded him to take the items out of the bag. The government fails to prove by "clear and positive evidence" that

Ketzner freely and voluntarily consented to a search of his bag. The Court

declines to uphold this search as a consensual one.

### E.   Robinson's Search of Ketzner's Bag Failed to Comport with the Strictures of *Terry v. Ohio*

The government argues that Robinson's search of Ketzner's bag was

also lawful as a protective search. It contends Robinson had prior

knowledge that Ketzner was involved in criminal activity. This knowledge, it

says, coupled with the $7,000 in cash, led Robinson to believe Ketzner was

a drug trafficker and therefore dangerous.

In *Michigan v. Long*, the Supreme Court recognized that a *Terry*

protective search may include areas from which an individual may gain

immediate access to weapons, including the passenger compartment of an

automobile. 463 U.S. 1032, 1046–47 (1983). The Court evaluates the

constitutionality of a protective search of containers near and within an

automobile in which a weapon may be placed or hidden, by applying the

principles of *Terry*. *See Long*, 463 U.S. at 1046 (holding "[a]lthough *Terry*

did involve the protective frisk of a person, we believe that the police action

in this case [a protective search of the passenger compartment of a car] is

justified by the principles that we have already established in *Terry* and

other cases"). *Terry v. Ohio* holds,

where a police officer observes unusual conduct which leads

him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

392 U.S. at 30.

The government contends that even though Robinson removed Ketzner from the car and patted him down for weapons, Robinson nevertheless possessed a reasonable belief that Ketzner was still dangerous and could gain immediate control of a weapon in a container in the car.

The search of the passenger compartment of a car "limited to those areas in which a weapon may be placed or hidden," is permitted "if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer to believe that the suspect is dangerous and the suspect may gain immediate control of weapons" *Long*, 463 U.S. at 1033. An officer's belief must not be based on subjective hunches but on information sufficient to cause a reasonably prudent person

under the circumstances to believe that either his safety or that of others is in danger. *Terry*, 392 U.S. at 27; *see also Long*, 463 U.S. at 1050.

The Court examines each of the factors Robinson testified to at the suppression hearing that he relied upon to develop reasonable suspicion:

(1) Robinson had previous contact with Ketzner and knew he was on bond for domestic violence and was not to possess weapons;

(2) Robinson believed that the way Ketzner's $7,000 was bundled was consistent with drug trafficking based on his training and experience; and

(3) Robinson believed, from his experience, that drug traffickers typically carry firearms.

The government argues that even if the Court rejects its argument that the SUV was subject to a lawful inventory search, the protective search doctrine highlights that the exclusionary rule must yield to the legitimate need for office safety. *See Long*, 463 U.S. at 1049 ("Our past cases indicate then that protections of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger that roadside encounters between police and suspects are especially hazardous, and that the danger may arise from the possible presence of weapons in the area of the suspect.").

### a. Robinson's Prior Knowledge of Ketzner's Alleged Criminal Activity

Robinson testified that before he searched Ketzner's bag, he knew that Ketzner was on bond for a domestic violence charge. He also testified that he believed Ketzner was involved in an incident where a gun was thrown out of a car and Ketzner was allegedly in it when the gun was tossed. These beliefs, the government says, bolstered Robinson's concern that Ketzner was dangerous.

First, Robinson did not indicate that the domestic violence charge involved weapons. Additionally, Ketzner was charged – not convicted of – domestic violence. *See United States v. Townsend*, 305 F.3d 537, 544 (6th Cir. 2002) (holding that an "arrest (without even a conviction) would carry very little weight in providing reasonable suspicion of more extensive criminal activity at the time of the stop"). Notably, the defendant in *Townsend* was arrested on a weapons charge and the court still considered it a "relatively minor indicator of criminal conduct." *Id*. at 545.

Second, a belief that Ketzner was inside a car where a gun was allegedly thrown out of that car, is far from the specific and articulable facts required by the Fourth Amendment. The government relies on *United States v. Walker*, 615 F.3d 728, 733-34 (6th Cir. 2010) to justify Robinson's protective search. However, the *Walker* facts are distinguishable.

22

In *Walker*, police responded to an urgent BOLO (Be on the Lookout) call of an armed bank robbery in progress. Bank tellers described the suspect and explained that he was armed with a semi-automatic silver pistol. Officers soon identified a car which matched the description provided by an eyewitness: it was the same color, make and model, and had the same license plate number. Officers observed a man approaching the car with a black duffel bag slung over his shoulder. When officers asked the man for identification, he said his ID was in the bag and he partially unzipped it. Officers then grabbed the bag, placed it on the ground, frisked the man for weapons, and partially unzipped the bag where they found a skeleton mask lying on top. They then stopped searching the bag, read the suspect his *Miranda* rights and obtained a search warrant to continue their search. Armed with a warrant, they fully searched the bag and discovered the money from the bank and a .22 caliber chrome firearm. *Walker*, 615 F.3d at 731. Additionally, the parties agreed that the officers had specific and articulable facts to believe they were dealing with an armed and dangerous individual.

In contrast, Robinson stopped the Equinox for a relatively minor infraction and not because it was involved in any nefarious activity. No one

23

inside the car reached under the seat or made suspicious or furtive gestures that could indicate the presence of a weapon.

Robinson's prior knowledge of Ketzner's alleged criminal history is insufficient to constitute reasonable suspicion that Ketzner was armed and dangerous.

### b. Robinson's Belief that $7,000 in Wads Indicated that Ketzner was Armed and Dangerous

Robinson testified that based on his experience, the manner in which Ketzner's cash was bundled indicated that Ketzner sold drugs. Robinson testified that only drug dealers arrange money in this fashion. If Ketzner sold drugs, Robinson believed he was dangerous and he was concerned for his safety and the safety of the public.

Courts have held that a large sum of money is one factor, among many, to justify officer's reasonable suspicion of criminal activity. *See United States v. Walton*, 258 F. App'x 753, 758 (6th Cir. 2007) (holding that a 1/4-inch stack of cash in the glove box was one of a combination of four factors which established reasonable suspicion). However, the Sixth Circuit has never held that cash alone justifies an officer's reasonable suspicion that someone with thousands of dollars in cash is *per se* dangerous. Robinson's belief that Ketzner's cash indicated that Ketzner was dangerous, is unfounded.

### c. Robinson's Belief that Drug Traffickers Typically Carry Firearms

Robinson testified that his experience as a police officer led him to believe that drug dealers carry guns.

The Sixth Circuit recognizes that a police officer can "rely on his [or her] training and experience that drug dealers frequently carry weapons...." *United States v. Heath*, 259 F.3d 522, 530 (6th Cir.2001); *see also United States v. Jacob*, 377 F.3d 573, 579 (6th Cir.2004) (holding the same). However, the Sixth Circuit "has always required some corroboration that the particular individual is involved in dealing drugs before allowing a frisk for weapons." *Id.*; *see, e.g., United States v. Branch, 537 F.3d 582, 589 (6th Cir. 2008)* (upholding a pat down after a drug dog alerted to the presence of narcotics in the automobile); *United States v. Garcia*, 496 F.3d 495, 505 (6th Cir. 2007) (upholding a pat down after officers overheard passengers—all suspected drug dealers—discussing weapons).

Robinson testified that he did not see nor did he smell any narcotics except marijuana. He revealed as much in his squad car: after he patted Ketzner down, he radioed, "I still have to search the car but I'm not seeing any dope." (16:40). He also admitted that he did not have any information that Ketzner was previously charged with or convicted of a crime involving the sale of narcotics. Robinson had no corroboration that Ketzner was

25

involved in drug dealing. Like the Court in *Noble*, this Court concludes that Officer Robinson lacked sufficient evidence to reasonably believe that Ketzner presented a danger to Robinson's safety or to the safety of others.

Police officers may ask a few questions regarding weapons and criminal activity, regardless of the stop's original purpose. *See United States v. Everett,* 601 F.3d 484, 495-96 (6th Cir. 2010). Police officers may also order a vehicle driver and passengers out of the vehicle without asking questions. *Maryland v. Wilson,* 519 U.S. 408, 414 (1997). But the Fourth Amendment does not tolerate – nor has the Supreme Court or the Sixth Circuit ever condoned – "pat-down searches without some specific and articulable facts to warrant a reasonable officer in the belief that the person detained was armed and dangerous." *Noble*, 762 F.3d at 525 (citing *Bennett v. City of Eastpointe*, 410 F.3d 810, 841 (6th Cir. 2005)).

Robinson's search of Ketzner's bag was not justified at its inception. The totality of circumstances do not demonstrate that Robinson had a reasonable and articulable suspicion that Ketzner was engaged in criminal activity or that he presented a danger to the safety of the officers or others.

### F.    The Inevitable Discovery Doctrine Does Not Apply

Finally, the government argues that the gun would have inevitably been discovered. Robinson testified that had Ketzner refused to comply

26

with his command to search the bag, Robinson would have placed the bag back into the Equinox and searched it as part of his inventory search. Ketzner did not address this argument in his briefing because the government first introduced it during the evidentiary hearing.

The inevitable discovery doctrine, an exception to the exclusionary rule, allows unlawfully obtained evidence to be admitted if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means. *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). The doctrine requires the Court to assess, "viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *Kennedy*, 61 F.3d at 498.

For the inevitable discovery doctrine to apply, the government must demonstrate "the existence of an *independent* untainted investigation that inevitably would have uncovered the same evidence" or "other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Wilson*, 806 F. App'x 450, 454 (6th Cir. 2020) (emphasis added) (citing *Kennedy*, 61 F.3d at 499-500)).

The government states only three potential avenues for the search of the Meijer bag to be deemed valid: (1) as an inventory search; (2) a

protective search; or (3) a consensual search. The Court has already rejected all of these as exceptions to the warrant requirement. The protective search was invalid because Robinson lacked specific and articulable facts to reasonably believe that Ketzner was dangerous. The government's consent argument is unpersuasive because Ketzner's consent was not freely and voluntarily given; Ketzner submitted to Robinson's authority.

The Court must examine whether there are compelling facts which demonstrate that the gun would have been inevitably discovered. In doing so, the Court must consider what would have happened had the illegal inventory search not occurred. *Kennedy*, 61 F.3d at 500. Robinson explained what would have happened if the protective search had not occurred and if Ketzner had not consented – he testified that he would have returned the bag to the car and would have searched it as part of his inventory search. The circular argument that the government is left with is this: even though Robinson conducted an *unlawful* initial inventory search, if Ketzner had refused to consent to the search of the bag, Robinson would have conducted a *lawful* inventory search and discovered the gun.

This stretches credulity. It is highly unlikely that Robinson would have placed the bag back in the Equinox and, all of a sudden, begun to properly

catalog and conduct a valid inventory search when he had done nothing of the sort up to that point.

The inevitable discovery doctrine does not apply.

## IV. CONCLUSION

The Court **GRANTS** Ketzner's Motion to Suppress Evidence Based on an Illegal Search and Seizure [ECF No. 18].

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  February 10, 2021